## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TANIA NUNEZ, JOHNNY CHU, ASHOK D. PANDYA and DAVID E. STERN, individually and on behalf of all others similarly situated, ) ) ) ) ) | |
| Plaintiffs, ) ) | **CIVIL ACTION NO.:** |
| v. ) ) | |
| B. BRAUN MEDICAL INC., BOARD OF DIRECTORS OF B. BRAUN MEDICAL INC., THE RETIREMENT COMMITTEE OF B. BRAUN MEDICAL INC. and JOHN DOES 1-30. ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** |
| Defendants. ) | |

## COMPLAINT

Plaintiffs, Tania Nunez, Johnny Chu, Ashok D. Pandya and David E. Stern ("Plaintiffs"), by and through their attorneys, on behalf of the B. Braun Medical Inc. Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include B. Braun Medical Inc. ("Braun" or "Company"), the Board of Directors of B. Braun Medical Inc. ("Board") and its members during the Class Period and the Retirement Committee of B. Braun Medical Inc. and its members ("Committee") during the Class Period for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

3.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

4.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[2]

5.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment.  *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses* (July 2016), at 4.  "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."  *Id.*, at 5.

9.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

10.     At all times during the Class Period (August 26, 2014 through the date of judgment) the Plan had at least $440 million dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $587 million dollars and $571 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under

management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

12.     In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider certain collective trusts available during the Class Period as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives. It appears that in July 2019, nearly ***five years*** into the Class Period, the Plan switched to the collective trust versions of the T.Rowe Price target date funds.  But this was too little too late as the damages suffered by Plan participants to that point had already been baked in.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

**Plaintiffs**

18. Plaintiff, Tania Nunez ("Nunez"), resides in Santa Ana, California.  During her employment, Plaintiff Nunez participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19. Plaintiff, Johnny Chu ("Chu"), resides in Chino, California. During his employment, Plaintiff Chu participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Ashok D. Pandya ("Pandya"), resides in Corona, California. During his employment, Plaintiff Pandya participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, David E. Stern ("Stern"), resides in Valley Stream, New York. During his employment, Plaintiff Stern participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

22.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

23.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

24.     Additionally, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a

claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

25.     Having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**Defendants**

**Company Defendant**

26.     Braun is the Plan sponsor and a named fiduciary with a principal place of business being 824 12th Avenue, Bethlehem, Lehigh County, Pennsylvania.  The December 31, 2018 Form 5500 filed with the United States Department of Labor ("2018 Form 5500") at 1.

27.     Braun describes itself as follows: "B. Braun Medical Inc. is part of a global organization that is ranked as the 14th largest medical device manufacture."[3] Braun further describes its operations as a "far-reaching family of companies [that] employs more than 61,000 people, and includes manufacturing, marketing, and sales operations in 64 countries throughout Asia, Europe, North America, the Pacific Rim and South America." *Id.* At the end of 2019 Braun realized over $470 million dollars in profit. The 2019 Annual Report of B. Braun Medical Inc. ("2019 Annual Report") at 16.

28.     The Company, acting through its Board of Directors, appointed the Retirement Committee of B. Braun Medical Inc. to oversee the operation of the Plan, and accordingly, had a concomitant fiduciary duty to monitor and supervise those appointees. *See*, the December 31, 2018 Auditor Report of B. Braun Medical Inc. Savings Plan ("2018 Auditor Report") at 5. As part of its

---

[3] https://www.bbraunusa.com/en/company/organization.html#our-primary-locations accessed on August 23, 2020.

responsibilities, the Committee is responsible for selecting and monitoring the performance of "[s]imple pre-assembled investment options" and "[a]dditional core investment choices." Retirement Benefits Guide of the B. Braun Medical Inc. Saving Plan available at http://www.bbraunbenefits.com/retirement.pdf ("Retirement Guide") at 1.

29.     Braun also made discretionary decisions to make profit sharing contributions to the Plan each year. As detailed in the 2018 Auditor Report: "[t]he Company may also elect to make a profit sharing contribution." 2018 Auditor Report at 6. "Profit sharing contributions for the year ended December 31, 2018 were $2,214,385." *Id.*

30.     The Company also acted through its officers, including the Board and Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

31.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Board Defendants</u>**

32.     The Company, acting through its Board of Directors, appointed the Retirement Committee of B. Braun Medical Inc. to oversee the operation of the Plan, and accordingly, had a concomitant fiduciary duty to monitor and supervise those appointees. *See*, 2018 Auditor Report at 5. As part of its responsibilities, the Committee is responsible for selecting and monitoring the performance of "[s]imple pre-assembled investment options" and "[a]dditional core investment choices." Retirement Guide at 1.

33.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint

and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

34.    The unnamed members of the Board of Directors for Braun during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

35.    The Retirement Committee of B. Braun Medical Inc. oversees the operation of the Plan. *See*, 2018 Auditor Report at 5. As part of its responsibilities, the Committee is responsible for selecting and monitoring the performance of "[s]imple pre-assembled investment options" and "[a]dditional core investment choices." Retirement Guide at 1.

36.    The Committee was appointed by the Company and Board of Directors. *See*, 2018 Auditor Report at 5.

37.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

38.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

39.    To the extent that there are additional officers, employees and/are contractors of Braun who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Braun officers, employees and/or contractors who are/were

9

fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.   THE PLAN

40.     The Retirement Guide describes the purpose of the Plan as: "[a]n excellent way to help you save for your retirement." Retirement Guide at 1.

41.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *See,* 2018 Auditor Report at 5.

### *Eligibility*

42.     In general, regular full-time employees are eligible to participate in the Plan.  2018 Auditor Report at 5. The 2018 Auditor Report states: "There is no age or service requirement to begin participating in the Plan; however, there is a one year service requirement to begin receiving employer matching contributions." *Id.*

### *Contributions*

43.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  *Id.*

44.     With regard to employee contributions, "[a]n employee may elect to contribute 0% to 50% of pretax earnings." *Id.* With regard to matching contributions made by Braun, after one year of service, Braun will match "100% of the first 3% of pretax contributions and 50% of the next 1% of pretax contributions for 2018 and 2017." *Id.*

45.     Like other companies that sponsor 401(k) plans for their employees, Braun enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

46.     Braun also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

47.     Given the size of the Plan, Braun likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

48.     Participants' contributions "are 100% vested and nonforfeitable." 2018 Auditor Report at 6. However, vesting in the Company's matching contributions is based on years of continuous service. As detailed in the 2018 Auditor Report: "[a] participant vests 20% annually until fully vested upon completing a fifth year of service." *Id.*

***The Plan's Investments***

49.     In theory, the Committee monitors the performance of  "[s]imple pre-assembled investment options" and "[a]dditional core investment choices." Retirement Guide at 1.  But in practice, as alleged below, that is not what happened.

50.     Several funds were available to Plan participants for investment each year during the putative Class Period.   Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.   *Id.* As noted above, the Committee, selects the investment funds that the Plan participants invest in.   *Id.*

51.     The Plan's assets under management for all funds as of December 31, 2018 was over $571,976,238.  2018 Auditor Report at 4.

***Payment of Plan Expenses***

52.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the 2018 Auditor Report "Administrative expenses of the Plan are paid by the Plan as provided in the Plan document." 2018 Auditor Report at 7.

## V.     CLASS ACTION ALLEGATIONS

53.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 26, 2014 through the date of judgment (the "Class Period").

54.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 6,332 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at p. 2.

55.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

56.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

        A.     Whether Defendants are fiduciaries of the Plan;

        B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

        C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

        D.     The proper form of equitable and injunctive relief; and

        E.     The proper measure of monetary relief.

57.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

58.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI.    DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

60.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

61.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

62.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

    (a)  they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

63.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *Sweda*, 923 F.3d at 333.

64.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." *Dep't of Labor ERISA Adv. Op. 88-16A*, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

65.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

66.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

67.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

68.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investment fund options chosen for a plan should not favor the fund provider over the plan's participants.  Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

69.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period, Defendants failed to have a proper system of review in place to ensure that

participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

70.    As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

### A.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

71.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participant's assets because of unnecessary costs.

72.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

73.     Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For  example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

74.     When large plans, particularly those with between $250 million dollars and $500 million dollars in assets[5] like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

75.     One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.

76.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between $250 million dollars and $500 million in assets).

---

[5] From 2014 through 2016, the Plan had assets under management of between $250 million dollars and $500 million dollars. In 2017, 2018 and subsequent years, the Plan had over $500 million dollars in assets under management. We use the more conservative number here but, in actuality, the Plan's buying power is understated.

77.     In 2018, for example, the expense ratios for 14 out of the 28 funds in the Plan (50%) in some cases had a difference of **51%** (in the case of Victory Munder Mid-cap Core Growth R6) above the median expense ratios in the same category.[6] The chart below illustrates these excessive expense ratios for each of the 14 funds:

| Current Fund | ER[7] | Category | ICI Median |
|---|---|---|---|
| TRRHX<br>T. Rowe Price Retirement 2025 | 0.63 % | Target-date Fund | 0.58% |
| TRRCX<br>T. Rowe Price Retirement 2030 | 0.66 % | Target-date Fund | 0.58% |
| TRRJX<br>T. Rowe Price Retirement 2035 | 0.68 % | Target-date Fund | 0.58% |
| TRRDX<br>T. Rowe Price Retirement 2040 | 0.70 % | Target-date Fund | 0.58% |
| TRRKX<br>T. Rowe Price Retirement 2045 | 0.71 % | Target-date Fund | 0.58% |
| TRRMX<br>T. Rowe Price Retirement 2050 | 0.71 % | Target-date Fund | 0.58% |
| TRRNX<br>T. Rowe Price Retirement 2055 | 0.72 % | Target-date Fund | 0.58% |
| TRRLX<br>T. Rowe Price Retirement 2060 | 0.72 % | Target-date Fund | 0.58% |
| HACAX<br>Harbor Capital Appreciation Inv | 0.67 % | Domestic Equity | 0.52% |
| JUSRX<br>JPMorgan US Equity R5 | 0.54 % | Domestic Equity | 0.52% |
| DDVIX<br>Delaware Value Inst | 0.68 % | Domestic Equity | 0.52% |
| NERYX<br>Loomis Sayles Core Plus Bond Y | 0.48 % | Domestic Bond | 0.43% |

[6] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[7]  The listed expense figures are taken from summary prospectuses published in 2019.

| Current Fund | ER[7] | Category | ICI Median |
|---|---|---|---|
| MIEIX<br>MFS Instl International Equity | 0.70 % | Int'l Equity | 0.64% |
| MGOSX<br>Victory Munder Mid-cap Core Growth R6 | 0.88% | Domestic Equity | 0.52% |

78.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than 2019 or even today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with between 250 million dollars and 500 million dollars in assets was 0.58% using 2015 data compared with 0.52% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

79.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Utilize Lower Fee Share Classes*

80.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

81.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

82.     Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

83.     Throughout the Class Period, the Plan offered T. Rowe Price Retirement Target date funds. These target date funds had expense ratio ranging from 0.53% to 0.72% in 2019 (these expense ratios would have been higher in 2014). However, since September of 2015, T. Rowe Price offered the I share versions of the same funds which were identical in all respects except for price.

84.     As demonstrated by the chart below, Defendants' failure to select the I share class was an indication of their failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses

2019 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| TRRFX<br>T. Rowe Price Retirement 2005 | 0.53 % | TRPFX<br>T. Rowe Price Retirement I 2005 I | 0.41 % | 29% |
| TRRAX<br>T. Rowe Price Retirement 2010 | 0.53 % | TRPAX<br>T. Rowe Price Retirement I 2010 I | 0.40 % | 32% |
| TRRGX<br>T. Rowe Price Retirement 2015 | 0.56 % | TRFGX<br>T. Rowe Price Retirement I 2015 I | 0.43 % | 30% |
| TRRBX<br>T. Rowe Price Retirement 2020 | 0.59 % | TRBRX<br>T. Rowe Price Retirement I 2020 I | 0.46 % | 28% |
| TRRHX<br>T. Rowe Price Retirement 2025 | 0.63 % | TRPHX<br>T. Rowe Price Retirement 2025 I | 0.50% | 26% |
| TRRCX<br>T. Rowe Price Retirement 2030 | 0.66 % | TRPCX<br>T. Rowe Price Retirement I 2030 I | 0.53 % | 24% |
| TRRJX<br>T. Rowe Price Retirement 2035 | 0.68 % | TRPJX<br>T. Rowe Price Retirement I 2035 I | 0.56 % | 21% |
| TRRDX<br>T. Rowe Price Retirement 2040 | 0.70 % | TRPDX<br>T. Rowe Price Retirement I 2040 I | 0.58 % | 20% |
| TRRKX<br>T. Rowe Price Retirement 2045 | 0.71 % | TRPKX<br>T. Rowe Price Retirement I 2045 I | 0.59 % | 20% |
| TRRMX<br>T. Rowe Price Retirement 2050 | 0.71 % | TRPMX<br>T. Rowe Price Retirement I 2050 I | 0.59 % | 20% |

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| TRRNX<br>T. Rowe Price Retirement 2055 | 0.72 % | TRPNX<br>T. Rowe Price Retirement 2055 | 0.59 % | 22% |
| TRRLX<br>T. Rowe Price Retirement 2060 | 0.72 % | TRPLX<br>T. Rowe Price Retirement 2060 I | 0.59% | 22% |

85.     In addition to the target dates funds discussed above, Braun also failed to identify identical lower share classes for other funds in the Plan as detailed in the chart, below.

| Current Fund | ER | Lower Share Class | ER | Excess Expense | Date Available |
|---|---|---|---|---|---|
| JUSRX<br>JPMorgan US Equity R5 | 0.54 % | JUEMX<br>JPMorgan US Equity R6 | 0.44% | 23% | Nov. 30 2010 |
| NERYX<br>Loomis Sayles Core Plus Bond Y | 0.48 % | NERNX<br>Loomis Sayles Core Plus Bond N | 0.39% | 23% | Feb. 1 2013 |
| TRRIX<br>T. Rowe Price Retirement Balanced | 0.51% | TRPTX<br>T. Rowe Price Retirement Balanced I | 0.38% | 34% | Sept. 29 2015 |
| FSSAX<br>Franklin Small Cap Growth ADV. | 0.82% | FSMLX<br>Franklin Smal Cap Growth R6 | 0.65% | 26% | May 1 2000 |

86.     The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

87.     As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, No. 18-3345, slip op. at 5 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).   The following is a sampling of the assets under management as of the end of 2018:

| Fund in Plan | 2018 Assets Under Management |
| --- | --- |
| T. Rowe Price Retirement 2025 | $81,667,161 |
| T. Rowe Price Retirement 2030 | $73,200,409 |
| T. Rowe Price Retirement 2020 | $62,517,099 |
| T. Rowe Price Retirement 2035 | $43,809,345 |
| T. Rowe Price Retirement 2040 | $36,090,329 |
| T. Rowe Price Retirement 2045 | $22,857,803 |
| T. Rowe Price Retirement 2015 | $17,498,267 |
| T. Rowe Price Retirement 2050 | $12,010,545 |
| T. Rowe Price Retirement 2055 | $7,402,715 |
| T. Rowe Price Retirement 2010 | $3,149,461 |
| T. Rowe Price Retirement 2005 | $2,435,064 |
| T. Rowe Price Retirement 2060 | $2,043,572 |
| JPMorgan US Equity R5 | $12,393,185 |
| Loomis Sayles Core Plus Bond Y | $9,946,131 |
| T. Rowe Price Retirement Balanced | $2,795,207 |
| Franklin Small Cap Growth ADV. | $5,848,135 |

88.     All of the lower share class alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified

the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

89.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.  Indeed, given that the lower-priced share classes were the same fund as the higher-priced classes, they had greater returns.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

90.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017) ("*Tibble III*").  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Id.* at * 11.  This lack of basic fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

91.     By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

***Failure to Investigate Availability of Lower Cost Collective Trusts***

92.     Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

93.     ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828.  Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

94.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

95.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash.  Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses.  As a result, their costs are much less, with lower or no administrative costs, and lower or no marketing or advertising

costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

96.     Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[8]

97.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to timely identify and select available collective trusts. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.

98.     Here, during the entire class period, T. Rowe Price offered collective trust versions of its target date funds, which currently have a minimum investment amount of only $20 million dollars. Given the fact that the Plan had $277 million dollars invested in target date funds in 2014, the Plan would have easily qualified for the collective trust versions beginning in 2014 or sooner. Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In 2018, for example, the Plan had twelve T. Rowe

---

[8] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

Price target date funds ranging from an expected retirement date of 2005 to 2060 at five-year intervals. The $20 million minimum buy in refers to the total of all assets held in all of the 12 funds collectively. In 2018, for example, the Plan had over $364 million dollars invested in target date funds and, as detailed above, that amount was over $277 million dollars in 2014. The chart below illustrates the cost difference between the T. Rowe Price Retirement target date funds and the collective trust versions:

| Current Fund | ER | Collective Trust Version | ER | Excess Expense |
|---|---|---|---|---|
| T. Rowe Price Retirement 2025 | 0.63 % | T. Rowe Price Retirement 2025 Trust A | 0.46% | 37% |
| T. Rowe Price Retirement 2030 | 0.66 % | T. Rowe Price Retirement 2030 Trust A | 0.46% | 43% |
| T. Rowe Price Retirement 2020 | 0.59 % | T. Rowe Price Retirement 2020 Trust A | 0.46% | 28% |
| T. Rowe Price Retirement 2035 | 0.68 % | T. Rowe Price Retirement 2035 Trust A | 0.46% | 48% |
| T. Rowe Price Retirement 2040 | 0.70 % | T. Rowe Price Retirement 2040 Trust A | 0.46% | 52% |
| T. Rowe Price Retirement 2045 | 0.71 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 54% |
| T. Rowe Price Retirement 2015 | 0.56 % | T. Rowe Price Retirement 2015 Trust A | 0.46% | 22% |
| T. Rowe Price Retirement 2050 | 0.71 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 54% |
| T. Rowe Price Retirement 2055 | 0.72 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 56% |
| T. Rowe Price Retirement 2010 | 0.53 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 15% |
| T. Rowe Price Retirement 2005 | 0.53 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 15% |
| T. Rowe Price Retirement 2060 | 0.72 % | T. Rowe Price Retirement 2045 Trust A | 0.46% | 56% |

99.     Accordingly, collective trusts were readily available to the Plan during the Class Period, which Defendants knew or should have known of their existence, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments. This is especially the case because during the Class Period, the Plan, at all times, maintained at least one collective trust in the Plan.

100.    But it was not until 2019 that the Plan finally switched to the CIT version of the T. Rowe Price target date funds as enumerated above. This unwarranted delay was inexcusable and frankly too late by at least 8 years. This is the case because the CIT version of the T. Rowe Price's target-date funds first became available in January of 2012. The Plan should have switched to the T. Rowe CIT target date funds as early as 2012 which would have saved the Plan millions.

101.    The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts, but Defendants again failed to investigate this option adequately.

102.    In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively Managed and Actively Managed Funds*

103.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

29

104.    While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

105.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

106.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such

that any difference was immaterial.  The alternative funds also had better performances than the Plan's funds in their 3 and 5 year average returns as of June 2020.  Indeed, as of 2019, the 5 year average return for DFA US Targeted Value I was worse than 67% of its peer funds.  And the 5 year average return for the Victory Munder Mid-Cap Core Growth R6 was worse than 95% of its peer funds.  A reasonable investigation would have revealed the existence of lower-cost and better performing alternatives to the Plan's funds.

107.    The chart below uses 2019 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Current Fund | 2019 ER | Passive/Active Lower Cost Alternative[9] | 2019 ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2025 | 0.63 % | Fidelity Freedom Index 2025 Investor | 0.12 % | Target-date Fund | 425% |
| | | American Funds 2025 Trgt Date Retire R6 | 0.33 % | | 91% |
| T. Rowe Price Retirement 2030 | 0.66 % | Fidelity Freedom Index 2030 Investor | 0.12 % | Target-date Fund | 450% |
| | | American Funds 2030 Trgt Date Retire R6 | 0.35 % | | 88% |
| T. Rowe Price Retirement 2020 | 0.59 % | Fidelity Freedom Index 2020 Investor | 0.12 % | Target-date Fund | 392% |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31 % | | 90% |
| T. Rowe Price Retirement 2035 | 0.68 % | Fidelity Freedom Index 2035 Investor | 0.12 % | Target-date Fund | 467% |
| | | American Funds 2035 Trgt Date Retire R6 | 0.37 % | | 84% |

[9] Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  Where only one fund is listed, index funds are identified by the word "index" following the fund name.  Actively managed funds don't have this designation.  The listed expense figures for the funds are taken from prospectuses published in 2019.

| Current Fund | 2019 ER | Passive/Active Lower Cost Alternative[9] | 2019 ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2040 | 0.70 % | Fidelity Freedom Index 2040 Investor | 0.12 % | Target-date Fund | 483% |
| | | American Funds 2040 Trgt Date Retire R6 | 0.38 % | | 84% |
| T. Rowe Price Retirement 2045 | 0.71 % | Fidelity Freedom Index 2045 Investor | 0.12 % | Target-date Fund | 491% |
| | | American Funds 2045 Trgt Date Retire R6 | 0.38 % | | 87% |
| T. Rowe Price Retirement 2015 | 0.56 % | Fidelity Freedom Index 2015 Investor | 0.12 % | Target-date Fund | 366% |
| | | American Funds 2015 Trgt Date Retire R6 | 0.31 % | | |
| T. Rowe Price Retirement 2050 | 0.71 % | Fidelity Freedom Index 2050 Investor | 0.12 % | Target-date Fund | 491% |
| | | American Funds 2050 Trgt Date Retire R6 | 0.39 % | | 87% |
| T. Rowe Price Retirement 2055 | 0.72 % | Fidelity Freedom Index 2055 Investor | 0.12 % | Target-date Fund | 500% |
| | | American Funds 2055 Trgt Date Retire R6 | 0.40 % | | 80% |
| T. Rowe Price Retirement 2010 | 0.53 % | Fidelity Freedom Index 2010 Investor | 0.12 % | Target-date Fund | 341% |
| | | American Funds 2010 Trgt Date Retire R6 | 0.31 % | | 71% |
| T. Rowe Price Retirement 2005 | 0.53 % | Fidelity Freedom Index 2005 Investor | 0.12 % | Target-date Fund | 341% |
| | | American Funds 2010 Trgt Date Retire R6 | 0.31 % | | 71% |
| T. Rowe Price Retirement 2060 | 0.72 % | Fidelity Freedom Index 2060 Investor | 0.12 % | Target-date Fund | 500% |

| Current Fund | 2019 ER | Passive/Active Lower Cost Alternative[9] | 2019 ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | American Funds 2060 Trgt Date Retire R6 | 0.41 % | | 76% |
| | | | | | |
| Harbor Capital Appreciation Inv | 0.67 % | JPMorgan Large Cap Growth R6 | 0.44 % | Domestic Equity | 52% |
| | | | | | |
| JPMorgan US Equity R5 | 0.54 % | Calvert US Large Cap Core Rspnb Idx I | 0.24 % | Domestic Equity | 125% |
| | | | | | |
| Delaware Value Inst | 0.68 % | Vanguard Value Index Adm | 0.05 % | Domestic Equity | 1,260% |
| | | Vanguard Equity-Income Adm | 0.18 % | | 278% |
| | | | | | |
| Loomis Sayles Core Plus Bond Y | 0.48 % | Loomis Sayles Core Plus Bond N | 0.39 % | Domestic Bond | 23% |
| | | | | | |
| DFA US Targeted Value I | 0.37 % | Vanguard Value Index Adm | 0.05 % | Domestic Equity | 640% |
| | | Vanguard Equity-Income Adm | 0.18 % | | 105% |
| | | | | | |
| MFS Instl International Equity | 0.70 % | Vanguard International Growth Adm | 0.32 % | Int'l Equity | 118% |
| | | | | | |
| Victory Munder Mid-cap Core Growth R6 | 0.88% | Vanguard Mid Cap Index Adm | 0.05% | Domestic Equity | 1,160% |

108.     The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been, given the bargaining power available to the Plan fiduciaries.

109.     With regard to the comparison of the actively managed funds to passively managed funds, these results are not surprising given that in the long-term, actively managed funds do not

outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did

not outperform their index counterparts in the five years ending June 30, 2019:[10]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed    Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

110.    A prudent investigation would have revealed the existence of these lower-cost and

better performing alternatives to the Plan's funds.

111.    Defendants' failure to investigate lower cost alternative investments (both actively

and passively managed funds) during the Class Period cost the Plan and its participants millions

of dollars.

**B.    Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

112.    The Plan's recordkeeper during the Class Period was T. Rowe Price.  See, the 2014

through 2018 Form 5500 Filings with the United States Department of Labor ("2014-2018 Form

5500s") at 3.

---

[10] Source: https://us.spindices.com/spiva/#/reports

113.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[11] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.   Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

114.    The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

115.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

---

[11] Qualified Domestic Relations Order.

116.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

117.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

118.    Further, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. . *George v. Kraft*

*Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

119.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[12]

120.    In this matter, during the Class Period, there was no contractual recordkeeper fee per participant. Rather, recordkeeping and administrative costs were paid using revenue sharing. The Plan reported the following revenue sharing payments during the Class Period on its 2014-2018 Form 5500s:

| Year | Participants | Direct | Direct | Indirect | Total | Per Participant Costs |
|------|------------|--------|--------|----------|-------|----------------------|
|      |            | T. Rowe RPS | Milliman | T. Rowe |       |       |
| 2014 | 4288 | $23,958 | $50,000 | $550,868 | $624,826 | $145.72 |
| 2015 | 4716 | $26,226 | $45,833 | $55,038 | $127,097 | $26.95 |
| 2016 | 5207 | $35,711 | $58,333 | $567,847 | $661,891 | $127.12 |
| 2017 | 5826 | $46,862 | $45,833 | $683,931 | $776,626 | $ 133.30 |
| 2018 | 6332 | $44,324 | $54,167 | $666,022 | $764,513 | $120.74 |

121.    The manner in which recordkeeping costs were paid for by the Plan's fiduciaries was clearly imprudent and disloyal to the Plan participants. The excess amount of money taken from revenue sharing that was never used to pay for recordkeeping and administrative costs cannot justify Defendants' selection of high-priced investment options to take advantage of revenue sharing. A more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or

---

[12] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

obtain reasonable direct compensation per participant recordkeeping/administration costs with no strings attached.

122.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to, among other things, send out RFPs to try to obtain lower recordkeeping costs than T. Rowe and Milliman were charging.

123.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.  One data source, the *401k Averages Book* (20th ed. 2020)[13] studies Plan fees for smaller plans, those under $200 million in assets.  Although it studies smaller plans than the Plan here, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should *decrease* as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the Plan, with half a billion dollars in assets and over 4,500 - 5,000 participants throughout the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

124.    Looking at the Plan's total compensation for recordkeeping and administrative costs also reveals fiduciary breaches.  As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan.  The maximum  indirect compensation received by T. Rowe and Milliman for recordkeeping

---

[13] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

services can be estimated to a reasonable degree of certainty using publicly available information[14] because revenue sharing is divvied among all the plan's service providers. *401k Averages Book*, at p. 7, Answer to FAQ No. 14.

125.   The total amount of recordkeeping fees (both through direct and indirect payments) per the Plan's form 5500 throughout the Class Period on a per participant annual basis was conservatively above $120 per participant per year with the exception of 2015 which was an anomoly.

126.   These amounts are clearly unreasonable as they are well above recognized reasonable rates for large plans which typically average around $35 per participant.[15]

127.   Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

128.   A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

---

[14] *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

[15] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

**C.**     **Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

129.     The structure of this Plan is rife with potential conflicts of interest because T. Rowe Price and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the Plan's Trustee is T. Rowe Price Trust Company, and an affiliate of T. Rowe performs the recordkeeping services for the Plan. *See,* 2018 Auditor Report at 1.

130.     This conflict of interest is laid bare in this case where lower-cost T. Rowe Price collective trusts and mutual funds – materially similar or identical to the Plan's other T. Rowe Price funds (other than in price) – were available but not selected because the higher-cost funds returned more value to T. Rowe Price.

131.     There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in T. Rowe Price's coffers.

132.     The Company, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise T. Rowe Price and its affiliates and ensure that the fees charged by T. Rowe Price and its affiliates were reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

133.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

134.     At all relevant times, the Committee and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

135.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

136.     The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence/Loyalty Defendants failed to investigate collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.   Likewise, the Prudence/Loyalty Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

137.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

139.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Braun and the Board Defendants)

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    Braun and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

142.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

143.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on

which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

144.   The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)   failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

(c)   failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

145.   As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

146.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee

Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

148.    **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as

necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.     Such other and further relief as the Court deems equitable and just.


Dated:  August 26, 2020                    **CAPOZZI ADLER, P.C.**

                                           /s/ Donald R. Reavey           .
                                           Donald R. Reavey, Esquire
                                           PA Attorney ID #82498
                                           2933 North Front Street
                                           Harrisburg, PA 17110
                                           donr@capozziadler.com
                                           (717) 233-4101
                                           Fax (717) 233-4103

/s/ Mark K. Gyandoh          .
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class