**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TANIA NUNEZ, JOHNNY CHU, ASHOK D. PANDYA AND DAVID E. STERN, Individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>B. BRAUN MEDICAL INC., BOARD OF DIRECTORS OF B. BRAUN MEDICAL INC., THE RETIREMENT COMMITTEE OF B. BRAUN MEDICAL INC. and JOHN DOES 1-30.<br><br>                    Defendants. | Case No. 5:20-cv-04195 |

## PLAINTIFFS' PRETRIAL MEMORANDUM

Plaintiffs Tania Nunez, Johnny Chu, and David E. Stern (collectively, "Plaintiffs"), by and through their undersigned counsel, pursuant to Rule 16.1 of the Local Civil Rules of Procedure and the Standing Order Regarding Trial Memoranda in Civil Cases incorporated in the Local Rules of Civil Procedure, as well as the Court's April 26, 2023, Scheduling Order, hereby submit this Joint Pretrial Memorandum:

   **1.   TRIAL COUNSEL FOR THE PLAINTIFFS:**

Mark K. Gyandoh
James A. Wells
Thomas Sinclair
CAPOZZI ADLER, P.C.
312 Old Lancaster Road Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: markg@capozziadler.com
          jayw@capozziadler.com
          thomass@capozziAdler.com

1

Donald R. Reavey
CAPOZZI ADLER, P.C.
2933 North Front Street Harrisburg, PA 17110
Telephone: (717) 233-4101
Facsimile: (717) 233-4103
Email: donr@capozziadler.com

## 2. JURISDICTION:

Plaintiffs do not dispute that the Court has subject matter jurisdiction over this action under Section 502 of the Employee Retirement Income Security Action ("ERISA"), 29 U.S.C. § 1132, and under 28 U.S.C. § 1331 because this action arises under the laws of the United States of America. Plaintiffs do not dispute that the Court has personal jurisdiction over all parties.

## 3. JURY/NON-JURY:

Pursuant to the Court's Order dated July 27, 2021 (Dkt. 53), all claims will be tried by a non-jury trial.

## 4. LENGTH OF TRIAL:

Plaintiffs estimate that the case will require up to 7 trial days, including 3 to 3.5 days for Plaintiffs' presentation (including cross-examination of its witnesses), and 3 to 3.5 days for Defendants' presentation (including cross-examination of its witnesses).

## 5. FURTHER PROCEEDINGS:

Plaintiffs do not believe a bifurcated trial is necessary.

## 6. NATURE OF THE CASE:

### a. Plaintiffs' Claims:

Plaintiffs bring this action individually and on behalf of the B. Braun Medical Inc. Savings Plan (the "Plan") against Defendants for breaches of fiduciary duties under ERISA. Plaintiffs assert that Defendants, which were/are fiduciaries to the Plan, breached their fiduciary duties of prudence under Section 404 of ERISA by: (1) failing to adequately review the Plan's investment

portfolio to ensure that each investment option was prudent, in terms of both cost-effectiveness and performance (2) failing to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants; (3) failing to effect a timely reduction in fees on several Plan investment options; and (4) failing to consider and offer collective trusts and obtain lower share classes of identical funds despite their far lower fees; and, (5) failing to obtain reasonable recordkeeping fees for the Plan, despite the ability to leverage the Plan's large size in fee negotiations

Defendants deny all claims.

### b. Plaintiffs' Defenses

Defendants do not assert any claims against Plaintiffs.

### 7. PLAINTIFFS' FACTUAL SUMMARY OF THE CASE

#### a. The Parties

The only remaining Defendant in this action is the Retirement Committee of B. Braun Medical Inc. ("the Committee")[1] which had the duty to oversee the operation of the B. Braun Medical Inc. Savings (the "Plan"), including the selection and monitoring of the Plan's investments.[2] Plaintiffs are former participants in the Plan during the Class Period (August 26, 2014, through the present). Plaintiff Tania Nunez was an employee of B. Braun Medical Inc. from August 22, 2016, to September 12, 2019. B.BRAUN_0000563 at B.BRAUN_0000592. By September 30, 2019, Plaintiff Nunez was no longer participating in the Plan. B.BRAUN_0000424. Plaintiff Johnny Chu was an employee of B. Braun Medical Inc. from July 25, 2016, to September 12, 2019. B.BRAUN_0000927, at B.BRAUN_0000966. Plaintiff Chu began investing in the Plan

---

[1] *See* ECF No. 49.

[2] Retirement Benefits Guide of the B. Braun Medical Inc. Saving Plan available at http://www.bbraunbenefits.com/retirement.pdf ("Retirement Guide") at 1.

3

soon after his employment commenced. B.BRAUN_0000240, at B.BRAUN_0000242. As of December 31, 2019, Plaintiff Chu was no longer participating in the Plan. B.BRAUN_0002713. Plaintiff David Stern began working for B. Braun Medical Inc. in September of 2008. B.Braun-0001878. Plaintiff Stern began investing in the Plan roughly two years after he began working for Braun. Stern Deposition Tr. 11:5-16. As of September 30, 2019, Plaintiff Stern was no longer participating in the Plan. B.BRAUN_0002145.

### b. Procedural History

Plaintiffs filed their Complaint (ECF No. 1) ("Compl.") on August 26, 2020. On June 4, 2021, the Court granted in part, and denied in part, Defendants' motion to dismiss. (ECF No. 49). On June 30, 2022, the Court granted Plaintiffs' Motion to Certify Class. (ECF No. 64), and defined the class as follows:

> "All persons, except [the] [d]efendants and their immediate family members, who were participants in or beneficiaries of the [B. Braun Medical Inc. Savings] Plan, at any time between August 26, 2014, through the date of judgment (the "Class Period")."
> *Id*.

Subsequently, the Court denied Defendants' motion for summary judgment on April 21, 2023. *See* ECF No. 112.

### c. The Plan

The Plan is a defined contribution plan and regular full-time employees are eligible to participate in the Plan. 2018 Auditor Report at 5. T. Rowe Price Retirement Plan Services, Inc. (T. Rowe) was the Plan's recordkeeper from 2009 to December 2019, when the Plan switched to Empower Retirement (Empower) for recordkeeping services. Dyson Opening Rpt. ¶ at 37. From the beginning of the Class Period through December of 2018 the Plan utilized a revenue sharing fee structure to pay recordkeeping fees to T. Rowe Price. *See* B. Braun Medical Inc., "First

Amendment to the Plan Recordkeeping Agreement Between B. Braun Medical Inc. and T. Rowe Price Retirement Plan Services, Inc.," April 1, 2014, B.BRAUN_0001784–785 at 784. In January of 2019, the Plan's fee structure changed to a "fee leveling" structure where T. Rowe Price was paid on a fixed per participant basis. *See* T. Rowe Price Recordkeeping Agreement Amendment 4 at 478; Vestal Transcript at 76:19-77:2. The Committee retained Milliman as an investment advisor for the Plan from at least the start of the Class Period through October 2021. Gissiner Opening Rpt. ¶ 94. Beginning November of 2021, the Plan retained Fiducient as an investment advisor. *Id*. at ¶ 95.

At the end of 2014, the first year of the Class Period, there were 4,288 participants in the Plan. See Gissiner Opening Rpt. ¶ 14 (Table 1).  As of December 31, 2020, there were 6,600 participants in the Plan.  *Id*.  Based on publicly filed DOL Form 5500s forms, at all times during the Class Period the Plan had at least $440 million dollars in assets under management. *See* Braun Medical Inc. Savings Plan, DOL Form 5500s, 2014–2020. The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.

### d.  The Challenged Funds

At all times during the Class Period, The Plan offered 28 or 29 investment options. Gissiner Opening Rpt. ¶ 16. From the beginning of the Class Period through 2019 the Plan's investment lineup included share classes that used revenue sharing to pay the Plan's recordkeeping expenses to the Plan's recordkeeper, T. Rowe Price. *Id*. at ¶ 68. Plaintiffs challenge at least 14 funds whose expense ratios were above the median expense ratio for their category. Compl. at ¶¶ 77-78 (listing specific funds and the median expense ratios of other funds in the same category found in similarly-size plans). During the Class Period, the Plan's largest holding was a series of Target Date Funds

5

(TDFs). *See* Defendants Statement of Facts in Support of Their Motion for Summary Judgment (ECF No. 78) ("SOF") at ¶13 (citing the Plan's Form 5500s from 2014-2020). In 2019, the Plan's investment line up changed by moving several mutual funds to lower share classes and replacing the T. Rowe Price TDF mutual funds with the T. Rowe Price Retirement Trust TDFs which are collective investment trusts. Nov. 2018 Plan & Investment Disclosure at 2675; Gissiner Opening Rpt. ¶ 18. During the entire Class Period, T. Rowe Price offered collective trust versions of its target date funds, which, as of 2020, had a minimum investment amount of only $20 million dollars for the total of all assets held in the 12 funds collectively. Compl. ¶ 98. From at least 2014 to 2018, the Plan had between $277 million and $364 million dollars invested in TDFs and thus qualified for the lower cost funds. *Id*. The challenged funds did not outperform the alternative options. Indeed, majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019.[3] For example, as of 2019, the 5-year average return for DFA US Targeted Value I fund in the plan was worse than 67% of its peer funds and the 5-year average return for the Victory Munder Mid-Cap Core Growth R6 fund in the plan was worse than 95% of its peer funds. Compl. ¶ 106.

### e. Defendants Breached Their Duty of Prudence to the Plan

The totality of the circumstances demonstrates defendants implemented an imprudent process in their administration of the plan.

#### i. The Plan Fiduciaries Failed to Provide Appropriate Oversight Regarding the Plan's Fee Structure

From at least the beginning of the Class Period (August 26, 2014) through December of 2018, the Plan used a fee structure known as revenue sharing where payments are made by

---

[3] Source: https://us.spindices.com/spiva/#/reports

investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide. A Plan expense Analysis dated March 31, 2014, demonstrated the total average annual revenue share of $194 per participant was collected while the recordkeeping cost at this time was a maximum of $75 annually per participant. Dyson Opening Rpt. ¶ 42(a). According to Plaintiffs' expert Eric Dyson, the excess revenue was parked in an administrative account so members could not choose how to invest the funds early on, and when rebates of the excess were eventually dispersed to the Plan and participants, they were not distributed back to each member in proportion to the amount that member paid. *Id*. at ¶ 41(ii-iii).

Plaintiffs' Expert Dyson opines "a prudent fiduciary would have pursued a better solution to solve the issue of excess revenue share and as a result would have been made aware of the possibility of using the Target Date CITs." *Id*. There is no evidence that a per capita charge was considered from the beginning of the Class Period up until 2019. *Id*. The Plan fiduciaries did not prudently weigh the competing interests of various classes of the Plan's participants. According to Plaintiffs' expert Eric Dyson, this caused the following issues:

    a. The total cost of revenue share absorbed by participants in the form of higher investment expenses far exceeded what was necessary.
    b. Plan investment fees were higher than necessary since the high revenue share resulted in investment costs higher than required.
    c. Although excess revenue share was eventually returned to The Plan participants it was flawed in that:

        i. The amount of revenue share was excessive. It was simply not necessary to withhold from the participants for plan revenue.
        ii. Money was held in a plan administration account and was otherwise not invested how each individual participant preferred, had they never had the excess revenue "parked," in an administration account. The overall impact to The Plan participants is similar to the concept of late contributions. The participants' money is not invested since they are not given access to it until a date in the future.
        iii. When dollars were returned to Plan participants it was not returned to

> them in a manner similar to which it was deducted from their investment accounts. Again, this is because The Plan fiduciaries failed to '[weigh] the competing interests of various classes of the Plan's participants and the effects of various allocation methods on those interests.' Money was returned to plan participants on a pro rata basis. In other words, regardless of whether or not a participant's account generated revenue share, all participants were given a credit based on the size of their account balance.

Dyson Opening Rpt. at ¶ 41. Importantly, "[i]nformation about the excessive amounts of revenue share were available to The Plan fiduciaries prior to the class period and could have been corrected had The Plan fiduciaries simply asked the right questions." Dyson Opening Rpt. ¶ 42.

### ii. Defendants Failed to Pursue and Obtain Lower Recordkeeping Fees for the Plan

Because of the Plan's large size, it had tremendous leverage to negotiate lower recordkeeping fees. In accordance with prudent monitoring practices, plan fiduciaries should determine the reasonableness of the plan's fees by completing regular fee benchmarks and a more formal Request for Proposal ("RFP") process at appropriate intervals. Dyson Opening Rpt. at ¶ 47. Mr. Dyson opined that the 2016 benchmark report conducted by Fiduciary Benchmarks informed the Defendants the Plan was paying significantly above the average fees in the report by ***"a figure of $46 more per participant per year than the benchmark group.*** A figure of $46 per participant per year over the average cost of similar plans warranted action by The Plan fiduciaries." *Id*. (Citing B.BRAUN_0008424 at B.BRAUN_0008427) (emphasis in original). The same report indicated the Plan's recordkeeping costs below average and investment manager costs as average on the third page, but the report contradicted itself on page 2 and page 4. *Id*. at ¶ 50. The report also found the overall fund expenses for the Plan were 0.58% compared to the average expense of 0.52%. *Id*. at ¶ 50. Mr. Dyson attributes the most likely cause of the inconstancy in the report was Defendants' inadequate oversight and misunderstanding of the Plan's revenue sharing structure and Defendants providing the Plan data used by Fiduciary Benchmarks to create the

8

report. *Id*. Another fee benchmark report conducted by Milliman in 2017 stated the Plan was overpaying recordkeeping cost in the amount of $274,736 per year. *Id*. at ¶ 48 (citing B.BRAUN_0012656). Mr. Dyson opines "$6,864 as a benchmark average for recordkeeping costs for a plan this size is clearly incorrect. Yet The Plan fiduciaries never question[ed] this benchmark and never questioned the use of a different benchmark service." *Id*. The fee benchmark reports the Plan obtained either confirm the Plan was overpaying or were too flawed to be considered legitimate.

In 2019, the Defendants conducted an RFP revealing the lowest available recordkeeping fee was $26 per person at Voya. *Id*. at ¶ 60. However, in 2020 and 2021, the Plan was paying $58 per participant annually to Empower. *Id*. Plaintiffs' expert opines that Defendants did not prudently leverage the 2019 RFP responses showing recordkeeping fee proposals by other recordkeepers charging less than half of what the Plan Participants paying. "The Plan fiduciaries could have used the data from the RFP to negotiate a better fee structure with Empower. A fee negotiation is a common practice which is undertaken by competent advisors when conducting recordkeeper RFPs on behalf of plan sponsors. It appears that this was never done." ¶ 60.

Using the 2019 RFP data, Mr. Dyson estimated excessive recordkeeping fees damages from Defendants' failure to prudently negotiate lower recordkeeping and advisor fees to be as high as $2.7 million. Dyson Opening Rpt. at ¶ 61. However, this amount is lower than the actual total damages amount because it does not account for the time period after the report (July 2022 through the date of judgement), nor does it include prejudgment interest from the excess revenue being parked in the administrative account. *Id*.

### iii. Defendants Failed to Establish a Prudent Process to Ensure Investment Costs Were the Lowest Possible

The Committee had an Investment Policy Statement (IPS) of criteria implemented for monitoring plan investments. Dyson Opening Rpt. ¶ 19. The IPS went unchanged for nine years. *Id.* The Senior Vice President, Human Resources for B. Braun, and Retirement Committee Member, Christopher Donigan testified he could not recall the IPS ever being reviewed in Committee meetings, and he did not review it on an ongoing basis. Donigan Dep. Tr at 76:22-77:4; 78:1-4. Moreover, Defendants did not hold quarterly meetings until 2019. *See* SOF at ¶ 18 (citing Donigan Dep. Tr. at 48:17-19, 48:25, 49:2-3, Vestal Dep. Tr. at 45:24-25, 46:2-4). The Committee only met once in the year 2015, once in the year 2016, and once in 2017. *Id.* (citing Ex. 61, Donigan Dep. Tr. at 48:20-24.) Plaintiffs' expert opines the Plan's IPS significantly lacked industry standard substantive and procedural prudence, particularly because it did not provide specific enough criteria to conduct a proper evaluation of investments in the plan. Dyson Opening Rpt. at ¶¶ 64, 69. Mr. Dyson opines this led to Defendants' failure to timely remove several funds, including the Victory Mid-Cap fund and other poorly performing funds alleged in Plaintiffs' Complaint, such as the Harbor Capital Appreciation Inv, JPM US Equity Inst/R5, Delaware Value Inst., Loomis Sayles Core Plus Bond Y, and the DFA US Targeted Value I. *Id.* at ¶ 69.

Plaintiffs' Expert also opines there was never a process in place to evaluate the Plan's Target Date Funds in accordance with the Department of Labor's target Date Guidance. *Id.* at ¶ 62. Defendants failed to look into the possibility of non-proprietary TDFs, failed to examine the possibility of a passive or hybrid suite of TDFs, failed to look into the possibility of a custom TDF for The Plan, and failed to determine that the glidepath of the existing TDFs was appropriate for the Plan participants. *Id.* at ¶ 62. Several less expensive target date funds were available in 2012, yet it took until 2019 for Defendants to make the switch. *Id.* at ¶17. Mr. Dyson opines that had

Defendants inquired about switching the Plan's funds to the available T. Rowe TDF CITs as early as 2014, they could have eliminated the revenue sharing fee structure and implemented a flat per capita fee of $56 per participant annually rather than the existing revenue share cost of $183 annually per participant. *Id*. at ¶ 45.

Mr. Dyson opines prudent fiduciaries consider the nonperformance of the more costly active funds alongside other active funds or even cheaper passive funds to realize more prudent options should be pursued. *Id*. at ¶24. However, Mr. Donigan's testimony did not reveal any diligence or prudent procedures conducted to determine if the higher cost actively managed funds were justified by outperforming alternatives. *Id*. at ¶¶ 70, 43. Plaintiffs' expert Cynthia Jones estimates the Lower Fee Alternative claims including prejudgment interest is $1.423 million dollars for Plaintiffs' lower fee alternative claims between the year in which the potential damages were incurred through March 31, 2022. Cynthia Jones Rpt. at ¶ 22.

## 8. RELIEF PLAINTIFFS ARE SEEKING:

For the reasons stated above and in the expert reports of Plaintiffs' Experts Dyson and Jones, Plaintiffs are seeking monetary relief of at least $4,123,000 dollars plus prejudgment interest to be allocated among the participants' individual accounts in proportion to the accounts' losses. Plaintiffs also seek an award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine, an award of costs pursuant to 29 U.S.C. § 1132(g), and case contribution awards to each of the named plaintiffs to be taken out of the common fund award should Plaintiffs succeed at trial. Pursuant to this Court's Order, Plaintiffs are not seeking injunctive relief. (ECF. No 49).

## 9.     TRIAL BY MAGISTRATE JUDGE:

Plaintiffs do not consent to a trial by a Magistrate Judge.

11

**10. LIST OF WITNESSES:**

a. Plaintiffs' Liability Expert Eric Dyson will testify regarding the imprudent processes and procedures of Defendants, the minimum and accepted standards of care for the conduct of retirement plan fiduciaries and how Defendants' conduct departed from those standards of care, as well as the damages Defendants' breach of duty of prudence cost the Plan and Participants.

b. Plaintiffs' Damages Expert Cynthia Jones will testify regarding the losses suffered by the Plan due to the retention of the challenged investments;

c. Christopher Donigan will testify as of cross regarding his service on the Committee and what Braun and the Committee considered (or failed to consider) in connection with the investments at issue and the recordkeeping and administrative fees charged to the Plan, as well as the Committee's acts and omissions with respect to the investments at issue, recordkeeping and administrative fees, and the activities of Braun and the Committee vis-à-vis the Plan.

d. Juliet Vestal, Committee Member and the Vice President of Corporate Benefits, will testify as of cross regarding her service on the Committee and what Braun and the Committee considered (or failed to consider) in connection with the investments at issue and the recordkeeping and administrative fees charged to the Plan, as well as the Committee's acts and omissions with respect to the investments at issue, recordkeeping and administrative fees, and the activities of Braun and the Committee vis-à-vis

the Plan.

## 11. DEPOSITION TESTIMONY:

The Parties have agreed not to submit deposition designations for any witnesses that are expected to attend the trial. Should any witnesses become unexpectedly unavailable at trial, the Parties have agreed not to object to deposition designations as untimely.

## 12. INTERROGATORIES/REQUEST TO ADMIT:

Plaintiffs will not be offering any responses to interrogatories or responses to requests for admission into evidence at trial.

## 13. EXHIBITS:

The Parties have agreed to a joint exhibit list which Defendants will submit. To avoid unnecessary redundancy, Plaintiffs do not attach the joint exhibit list here.

Plaintiffs do not presently anticipate any evidentiary issues not addressed by way of objections or motions *in limine*.

Dated: June 21, 2023                                Respectfully submitted,

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
(admitted *pro hac vice*)
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax (717) 233-4103
Email: markg@capozziadler.com

**CAPOZZI ADLER, P.C.**
Donald R. Reavey, Esquire
(admitted *pro hac vice*)
2933 North Front Street
Harrisburg, PA 17110
Tel.: (717) 233-4101
Fax (717) 233-4103

Email: donr@capozziadler.com

*Counsel for Plaintiffs and
the Putative Class*