IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TANIA NUNEZ, JOHNNY CHU, ASHOK D. PANDYA, and DAVID E. STERN, individually and on behalf of all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 20-4195 |
| v. | : : | |
| B. BRAUN MEDICAL, INC., BOARD OF DIRECTORS AT B. BRAUN MEDICAL INC., THE RETIREMENT COMMITTEE OF B. BRAUN MEDICAL INC., and JOHN DOES 1-30, | : : : : : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                 August 18, 2023

This case involves participants of a retirement savings plan bringing a class action lawsuit under the Employee Retirement Income Security Act against the plan's overseeing committee. Specifically, the plaintiffs assert that the committee breached its duty of prudence regarding how it handled the plan's investment funds and recordkeeping expenses during the defined class period.

The plaintiffs' duty-of-prudence claim survived the committee's motion to dismiss and subsequently its motion for summary judgment. Thus, the case ultimately culminated in a three-day bench trial during which both sides presented evidence and testimony to the court. The plaintiffs argued that the committee, *inter alia*, failed to (1) investigate or select lower cost alternative funds for the plan, and (2) monitor or control the plan's recordkeeping expenses. Meanwhile, the committee asserted that it had a prudent process in place for monitoring and controlling investment funds and recordkeeping expenses and that the plan's investment fund

options and recordkeeping expenses were themselves prudent. Thus, both sides asked the court to find in their favor.

Upon weighing the evidence and the credibility of the witnesses, the court finds for the committee. For one, the court finds that, during the class period, the committee indeed engaged in objectively prudent conduct in its monitoring and handling of the plan's investment funds and recordkeeping expenses. Likewise, the court finds that the plan's investment fund options and recordkeeping expenses were objectively prudent throughout the class period. Accordingly, the court must enter judgment in favor of the committee and against the plaintiffs.

## I.    PROCEDURAL HISTORY

On August 26, 2020, Tania Nunez ("Nunez"), Johnny Chu ("Chu"), Ashok D. Pandya ("Pandya"), and David E. Stern ("Stern")—participants in the B. Braun Medical Inc. Savings Plan ("Plan")—filed a complaint against B. Braun Medical Inc., the Board of Directors of B. Braun Medical Inc., the Retirement Committee of B. Braun Medical Inc. ("Committee"), and John Does 1–30. *See* Compl., Doc. No. 1. The complaint offers three specific allegations: (1) the defendants breached their fiduciary duties under the Employee Retirement Income Security Act ("ERISA") by failing to investigate and select lower cost alternative funds for the Plan; (2) the defendants failed to monitor or control the Plan's recordkeeping expenses; and (3) the defendants breached their duty of loyalty to the Plan and its participants. *See id.* at ¶¶ 71–132. Based on these allegations, the complaint contains three claims for relief: breach of fiduciary duty of loyalty (against the Committee), breach of fiduciary duty of prudence (against the Committee), and failure to adequately monitor other fiduciaries (against the remaining defendants).[1] *See id.* at ¶¶ 133–46.

---

[1] The complaint only includes a "first claim for relief" and "second claim for relief." *See* Compl. at pp. 40, 42. Nevertheless, the "first claim for relief" contains both the duty-of-loyalty claim and duty-of-prudence claim, hence why the court considers the complaint to be asserting three separate claims. *See id.* at p. 40.

On November 9, 2020, the defendants filed a motion to dismiss the complaint, *see* Doc. No. 21, which the court granted in part and denied in part. *See* June 4, 2021 Order, Doc. No. 49. Specifically, the court dismissed the complaint's duty-of-loyalty and duty-to-monitor claims, *see id.* at ¶¶ 1.a–.b, leaving duty of prudence as the complaint's sole remaining claim and the Committee as the sole remaining defendant. The court subsequently granted a motion to drop Pandya as a plaintiff, *see* Doc. No. 58, thus rendering Nunez, Chu, and Stern the remaining plaintiffs in this case.

On November 26, 2021, the plaintiffs filed a motion for class certification, proposing the following class:

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between August 26, 2014 through the date of judgment (the "Class Period").

Pls.' Mot. for Class Certification at ECF p. 1, Doc. No. 56. The court granted this motion initially on June 30, 2022, approving the plaintiffs as representatives of the aforementioned proposed class. *See* June 30, 2022 Order at ¶¶ 1–3, Doc. No. 69. In its approving order, the court also required the plaintiffs to send notice to class members. *See id.* at ¶¶ 5–8. Nevertheless, the court vacated this order a month and a half later upon determining that notice was not required and subsequently entered an order recertifying class without the notice requirement. *See* Doc. No. 72.

On September 26, 2022, the Committee filed a motion for summary judgment on the remaining duty-of-prudence claim. *See* Doc. No. 77. After receiving the plaintiffs' response in opposition and hearing oral argument, the court ultimately denied the motion upon finding genuine issues of material fact needing to be resolved by a factfinder. *See* Doc. No. 112. The court

subsequently scheduled this case for a bench trial in a second amended scheduling order.[2] *See* Doc. No. 114.

The parties each filed pretrial memoranda on June 21, 2023. *See* Doc Nos. 118–19. The Committee also filed two motions *in limine* on the same day to exclude to varying degrees the expert reports and testimonies of Eric Dyson ("Dyson") and Cynthia Jones ("Jones"). *See* Doc. Nos. 120–21. On June 28, 2023, the parties filed a joint stipulation of facts, *see* Doc. No. 122, and separately emailed their respective proposed findings of fact and conclusions of law to chambers. Starting on July 12, 2023, the court held a three-day trial in which the court heard testimony from Christopher Donigan ("Donigan"), Juliet Vestal ("Vestal"), Dyson, Jones, and Steven Gissiner ("Gissiner"). The court also received designations from the respective depositions of Nunez, Chu, and Stern. Following trial, the court received amended proposed findings of fact and conclusions of law from the parties. The matter is now ripe for resolution.

## II.    FINDINGS OF FACT

### A.    Stipulated Facts

1.      The court finds the following facts as stipulated by all parties:[3]

2.      B. Braun Medical, Inc. ("B. Braun" or the "Company") is a medical device company with its headquarters in Bethlehem, Pennsylvania. It sponsors the aforementioned Plan to help its employees save for retirement.

3.      The Plan is a defined-contribution retirement plan allowing participants to set aside a portion of their income in pre-tax dollars to save for retirement. Participants in the Plan can contribute a portion of their salaries to their individual Plan accounts.

---

[2] Generally, plaintiffs are not entitled to a jury trial under ERISA. *See Cox v. Keystone Carbon Co.*, 894 F.2d 647, 650 (3d Cir. 1990). Regardless, the plaintiffs here did not make a jury demand when filing their complaint. *See* Civil Cover Sheet at ECF p. 1, Doc. No. 1-1.
[3] These facts are located in the parties' Joint Stipulation of Facts. *See* Doc. No. 122.

4.      The Plan has grown from about 4,300 participants with account balances and $440 million in Plan assets in 2014 to about 6,600 participants with account balances and $790 million in Plan assets in 2020.

5.      B. Braun contributes its own funds to the Plan in the form of an employee match equal to a set percentage of participant 401(k) contributions. As of June 2019, it matched 100% of the first 3% of participant contributions and 50% of the next 1% of participant contributions. The Company made the following contributions to participants' accounts during the Class Period:

- 2014: $7.9 million

- 2015: $8.7 million

- 2016: $10 million

- 2017: $12.9 million

- 2018: $13.2 million

- 2019: $15.3 million

- 2020: $17.7 million

6.      The Plan had approximately the following participant level and assets from 2014 to 2020:

- 2014: 4,300 participants with account balances; $440 million in Plan assets

- 2015: 4,700 participants with account balances; $450 million in Plan assets

- 2016: 5,200 participants with account balances; $490 million in Plan assets

- 2017: 5,800 participants with account balances; $585 million in Plan assets

- 2018: 6,300 participants with account balances; $570 million in Plan assets

- 2019: 6,600 participants with account balances; $675 million in Plan assets

- 2020: 6,600 participants with account balances; $790 million in Plan assets

7.     The Committee is responsible for overseeing the Plan. In particular, the Committee selects and monitors the investment options in the Plan's lineup, monitors the Plan's investment and recordkeeping fees, and engages an independent investment consultant to assist with these decisions.

8.     Committee members are employees of B. Braun with backgrounds in areas such as benefits, finance, accounting, legal, and human resources, among others.

9.     From the beginning of the Class Period through October 2021, the Committee retained Milliman as its investment advisor to assist in selecting and monitoring the Plan's investment options and fees. Since November 2021, the Committee has retained Fiducient Advisors ("Fiducient") to perform those same responsibilities.

10.    From the beginning of the Class Period through December 2019, the Committee retained T. Rowe Price as its recordkeeper to perform day-to-day administrative services for the Plan. Since December 2019, the Committee has retained Empower to perform those same responsibilities.

11.    As reflected in meeting minutes, the Committee met on the following dates during the Class Period:

- April 22, 2014

- November 21, 2014

- July 29, 2015

- February 22, 2016

- March 8, 2017

- May 11, 2018

- May 17, 2018

- May 22, 2018

- June 19, 2018

- September 17, 2018

- November 2, 2018

- February 11, 2019

- May 30, 2019

- August 15, 2019

- September 27, 2019

- December 10, 2019

- February 6, 2020

- May 21, 2020

- June 26, 2020

- July 30, 2020

- November 9, 2020

- February 12, 2021

- May 6, 2021

- August 15, 2021

- September 9, 2021

- November 10, 2021

- February 15, 2022

### 1.      The Plan's Investment Options

#### a.      Overview of the Plan's Investment Options

12.      The Plan offered between 28 and 29 investment options at any given time during the Class Period. These options included a series of target date funds ("TDFs"), at least one collective investment trust ("CIT"), as well as a mix of actively managed and passively managed mutual funds.[4]

13.      Actively managed funds use fund managers to buy and sell stocks in an effort to outperform a specific index, such as the S&P 500. Passively managed funds (which are also known as "index funds") track an established market index, and the fund manager does not make any independent investment choices. Index funds tend to be less expensive than actively managed funds, in which the fund's investment advisers exercise supervision over which investments are suitable for the fund and its investors.

14.      Mutual funds typically have various types of investors, ranging from small individual retail investors to large retirement plans. To account for this wide range of potential investors, mutual funds offer different share classes. Each share class is a specific version of a mutual fund with particular pricing, referred to as the "expense ratio," and a specific revenue sharing structure. The difference in expense ratio takes into consideration the differences in the costs associated with distributing and providing services to each type of investor. In the context of 401(k) plans, the most important (and often only) difference between share classes is usually the amount of "revenue sharing" paid to the plan recordkeeper.

---

[4] The Plan's investment lineup at year-end 2014 through year-end 2020, including changes from year-to-year, is set forth in an attached exhibit to the Joint Stipulation of Facts. *See* Joint Stipulation of Facts, Ex. A, Investments On/Off at ECF pp. 2–9, Doc. No. 122-1.

15.     The Plan's largest holding during the Class Period was a series of TDFs. TDFs hold an underlying investment portfolio based on a target retirement year and adjust the portfolio to become more conservative as the target year approaches.

16.     For most of the Class Period, the Plan's TDFs were the T. Rowe Price Retirement TDFs, which were actively managed mutual funds. In 2019, the Committee decided to replace those funds with the T. Rowe Price Retirement Trust TDFs, which were actively managed CITs.

17.     Mutual funds and CITs are different in certain ways, such as that mutual funds are regulated by the U.S. Securities and Exchange Commission ("SEC") whereas CITs are not regulated by the SEC. As a result, there are differences in compliance and disclosure requirements between mutual funds and CITs. Additionally, CITs typically have lower fees than mutual funds and typically have a mutual fund counterpart composed of the same or similar underlying funds. However, CITs are not necessarily better investment options than mutual funds and vice versa.

18.     Section I.C.2.a of the Plan's Investment Policy Statement ("IPS")—Construction of the Investment Option Menu—provides an allowance for both mutual funds and collective trusts.

19.     While the Committee could consider offering CITs in the Plan's investment lineup, the Committee was not required to offer CITs in the Plan's investment lineup. The Plan did, in fact, include a CIT throughout the Class Period—the T. Rowe Price Stable Fund. Also, beginning in 2019, the Plan transitioned to the CIT version of the T. Rowe Price TDFs.

           b.      The Committee's Review of Investment Options

20.     During the Class Period, the Plan had an IPS in effect. The IPS was adopted in 2010, and amended and restated in 2019, and again in 2022.

21.     The purpose of the IPS was to guide the Committee's actions.

22.     Pursuant to the IPS, the Committee used a watchlist to monitor investments that caused it concern and required an increased level of scrutiny due to, for example, underperformance or a change in management. The Committee voted to remove funds from the Plan's investment lineup that had continued underperformance.

23.     The Committee received an investment update at each Committee meeting. At each meeting, Milliman (and later Fiducient) gave the Committee a written report with detailed information about the Plan's investments. These materials included information about fees, performance over various periods, performance against industry benchmarks, and other key metrics. Milliman and Fiducient also prepared detailed monthly and quarterly reports with similar information for Committee members to review.

24.     The Committee's minutes reflect discussion of investment performance at numerous meetings, including:

- April 22, 2014

- November 21, 2014

- July 29, 2015

- February 22, 2016

- May 22, 2018

- February 11, 2019

- May 30, 2019

25.     Committee meeting minutes and materials reflect that the investment options in the Plan's lineup performed well, including the T. Rowe Price TDFs. Such meetings include:

- November 21, 2014

- July 29, 2015

- February 22, 2016

- March 8, 2017

- March 22, 2018

26.    Morningstar, Inc. ("Morningstar")—a financial services firm that is often used for independent investment research and analysis—has recognized the T. Rowe Price TDFs as strong performers. Morningstar reported in 2018 that the funds' "three-, five-, and 10-year returns [had] handily outpaced the majority of [their] peers." Joint Stipulation of Facts at ¶ 25 (alterations in original).

c.    <u>Share Classes and Revenue Sharing</u>

27.    Managers of an investment option can offer different "share classes" of that option, with each share class having the same underlying holdings but a different pricing structure.

28.    The fee difference between two share classes of a given investment option offered to a 401(k) plan may be attributable to the amount of "revenue sharing" from that share class available to the plan. "Revenue sharing" is a practice whereby a mutual fund pays a portion of the fund's expense ratio to the plan's recordkeeper, and the recordkeeper uses that amount to reduce or eliminate recordkeeping fees that plan participants would otherwise have to pay through a direct charge.

29.    Revenue sharing is a common and permissible way to pay recordkeeping fees when the revenue sharing arrangement is reasonable.

30.    Committee meeting minutes reflect discussion of share classes and/or revenue sharing at numerous meetings, including:

- April 22, 2014

- November 21, 2014

- February 22, 2016

- March 8, 2017

- May 11, 2018 and May 17, 2018 Ad Hoc Meetings

- May 22, 2018

- June 19, 2018 Subcommittee Meeting

- September 17, 2018

- August 15, 2019

- September 27, 2019

31.     Until January 2019, the Plan lineup contained share classes that included revenue

sharing to pay the Plan's recordkeeping expenses.

### 2.     The Plan's Recordkeeping Fees

a.     The Plan's Recordkeepers and Recordkeeping Compensation Arrangements

32.     Like all 401(k) plans, the Plan incurs recordkeeping costs that encompass the day-

to-day administrative services needed to run a 401(k) plan. These services include processing Plan

participant and sponsor transactions, determining and allocating investment gains and losses,

posting interest and dividend payments, and communicating with participants and B. Braun about

the Plan.

33.     An employer's decision concerning the way recordkeeping fees are paid—for

example, by the employer or by the plan—is a question of plan design, not a fiduciary function.

However, monitoring the prudence and reasonableness of recordkeeping fees is a fiduciary

function.

34.     The Plan had two recordkeepers during the Class Period.

35.     T. Rowe Price served as the Plan's recordkeeper from 2009 until 2019.

36.     The Committee selected T. Rowe Price as the Plan's recordkeeper in 2009 after issuing a formal Request For Proposal ("RFP") and evaluating competing bids.

37.     From the time that T. Rowe Price was retained as recordkeeper in 2009 until 2019, T. Rowe Price was compensated for its various services to the Plan through revenue sharing.

38.     Pursuant to the recordkeeping agreement, the amount T. Rowe Price received each year in revenue share was capped, thereby fixing the annual recordkeeping fee. The fixed fee was $56 per participant from 2014 to 2016 and $50 per participant from 2016 to 2018. Under the agreement, T. Rowe Price periodically rebated any revenue exceeding the fixed cap to the Plan's administrative account.

39.     In 2014, the Committee adopted Milliman's recommendation that the Plan move from higher-cost shares to lower-cost shares for five mutual funds in conjunction with the decrease in T. Rowe Price's recordkeeping fee, which meant that the Plan needed to derive less revenue from investments to pay for recordkeeping expenses.

40.     In October 2017, Milliman conducted an analysis of the Plan's share classes that was provided to the former Vice President of Benefits, Myrna Rivera ("Rivera"), and other Committee members who served on the Benefits team. Milliman's analysis showed that for nearly all investments, the Plan was invested in the fund with the lowest net expense. As part of this review, Milliman also benchmarked total plan expenses, including plan investment expenses.

41.     In June 2018, Milliman conducted another analysis of the Plan's share classes that was provided to Rivera and other Committee members who served on the Benefits team. Milliman found that moving the Plan's investment options to the lowest-fee share class would slightly increase Plan expenses when factoring in revenue sharing. Specifically, Milliman noted that: "Revenue sharing currently reduces plan expense (administration, audit and advisory fees) and the

remainder is allocated back to participant accounts. . . . [R]egardless of which share class utilized (for the target date funds, which hold 65% of the plan assets), the Net Fund Expense and Total All-in cost, amount to nearly the same Net Fund Expense and the Total All-in Plan Expense. So moving to the lowest expense share class, doesn't yield an expense reduction (if revenue sharing is paid back to participants)." Joint Stipulation of Facts at ¶ 39 (alteration in original).

42.     The funds in the administrative account were used to pay Plan related expenses, and any remaining amounts were then periodically rebated back to Plan participants on a pro rata basis. The Plan made the following rebates to participant accounts during the Class Period:

- $1,000,000 in 2015

- $500,000 in 2016

- $500,000 in 2017

- $599,999.73 in 2018

- $915,144.42 in 2019

43.     In January 2019, the compensation arrangement was changed, and the Plan compensated T. Rowe Price through a fixed per-participant fee of $42 with no revenue share kept by T. Rowe Price, otherwise known as "fee leveling."

44.     In conjunction with this change, the Plan moved to lower share classes for numerous mutual funds when it transitioned to a hard-dollar per-participant charge for recordkeeping. The Plan also moved its T. Rowe Price TDF offerings to CITs at this time—in line with industry trends. Over approximately the past decade, collective trusts have increased in popularity as investment options for TDFs. In 2010, 22% of plans offered collective trusts as an option for its TDFs. By 2020, 41% of plans offered collective trusts as an option for its TDFs. However, 42% of plans still used mutual funds. Had the Committee transitioned to CITs before

implementing "fee leveling," there would not have been enough revenue share generated by the Plan's investment options to pay for recordkeeping expenses under the existing fee structure.

45.     In December of 2019, the Committee selected Empower to replace T. Rowe Price after conducting an RFP, and Empower has served as the recordkeeper since.

46.     Pursuant to Empower's agreement with the Plan, Empower charged a flat annual fee of $45 per participant for recordkeeping services. In addition to Empower's $45 per participant fee, the Plan charged participants an additional $13 fee from December 2, 2019 to June 30, 2021 and a $9 fee from July 1, 2021 onward. This additional fee funded an ERISA budget account. An ERISA budget is a common feature of 401(k) plans and is often used to pay for non-recordkeeping related expenses such as investment advisory, legal, and accounting services. Although Empower collected this fee for the Plan, the fee is distinct from recordkeeping fees paid to Empower.

           b.      The Committee's Review of Recordkeeping Fees

47.     Committee meeting minutes reflect discussion of recordkeeping fees at numerous meetings, including:

- April 22, 2014

- November 21, 2014

- February 22, 2016

- March 8, 2017

- September 17, 2018

48.     Immediately prior to the start of the Class Period, in April 2014, the Committee hired Towers Watson "to conduct a benchmarking study related to competitive fees and services which included a review of the expense ratios associated with the current investment line-up." Joint Stipulation of Facts at ¶ 46. The results of the benchmarking study indicated T. Rowe Price

ranked highly in "plan administration, communications and education and participant services," *id.*, but that T. Rowe Price was receiving fees that were higher than the median comparator fee. Specifically, T. Rowe Price was receiving approximately $75 per participant in administrative revenues, compared with the median comparator fee of $66 per participant. As a result of this benchmarking study, in April 2014, before the start of the Class Period, the Plan negotiated with T. Rowe Price to reduce its fees from $75 per participant to $56 per participant.

49.    In October 2016, Fiduciary Benchmarks—an experienced and well-known consulting firm—prepared a fee benchmarking report for the Plan. The report compared the Plan's recordkeeping fees to a peer group (i.e., plans with similar assets and number of participants). The peer group sample included 33 plans.

50.    In October 2017, Milliman performed a benchmarking exercise for the Plan. Milliman identified comparable plans based on the average account balance, total plan assets, and number of participants.

51.    Milliman later conducted a Request for Information ("RFI") on behalf of the Plan in July 2018. An RFI is a process whereby a consultant (Milliman in this case) goes out to the market and asks certain service providers to provide their price for recordkeeping services assuming certain parameters. All but two responses to the RFI were equal to or higher than the Plan's recordkeeping fee at the time. The two that were lower did not include certain services that T. Rowe Price provided.

52.    In 2018, the Committee formed a subcommittee to review the feasibility of converting the recordkeeping pricing structure to a "fee leveling" arrangement. In part, the Committee was considering this switch because it would more evenly distribute fees among Plan participants and the practice was becoming more prevalent in the industry. This effort ultimately

culminated in the Plan transitioning to a "fee leveling" structure for recordkeeping effective January 2019.

53.     In early 2019, the Committee decided to conduct an RFP led by Mercer, a well-regarded retirement plan consultant, to assess its recordkeeping services. Mercer developed and distributed an RFP to seven recordkeepers, six of whom were among the ten largest 401(k) recordkeepers by total assets. The RFP asked that the service providers present their bids in an "open architecture" format, meaning the Plan was not required to select the bidders' proprietary investment options for its platform (which would have required the Plan to change its investment lineup). At the time, the Committee was satisfied with its investment lineup and was not interested in switching out investments as part of the recordkeeping RFP process. After receiving detailed responses from all seven recordkeepers, the Committee selected three finalists with Mercer's assistance: Fidelity, Voya, and Empower. Empower ranked first among the finalists in 10 out of 11 categories, including participant experience and communications and education, while offering the second lowest recordkeeping fee. Ultimately, the Plan retained Empower as a recordkeeper effective December 2, 2019. Although selecting a new recordkeeper, the Committee wanted to retain the same investment lineup that the Plan had with T. Rowe Price.

54.     The lowest proposed discounted recordkeeping fee in the 2019 RFP was $26 per participant, offered by Voya. This discount was contingent on the Plan offering Voya's proprietary funds. Voya's final proposed "open architecture" bid was $43 per participant, while Empower's final bid was $45 per participant.

55.     The Plan's current investment adviser, Fiducient, performed a benchmarking study for the Plan in 2021. The study concluded that the Plan's recordkeeping fee was less (per

participant) than the average recordkeeping fee for both comparators—plans with more than $500 million in assets and plans with more than 5,000 participants.

56.    The Plan's recordkeeping fee per participant from 2014 through 2019 was as follows:

| Year | Per-Participant Recordkeeping Fee | Recordkeeper |
|------|-----------------------------------|--------------|
| 2014 | $56 | T. Rowe Price |
| 2015 | $56 | T. Rowe Price |
| 2016 | $50 | T. Rowe Price |
| 2017 | $50 | T. Rowe Price |
| 2018 | $50 | T. Rowe Price |
| 2019 | $42 | T. Rowe Price |
| 2019 | $45 | Empower |

### B.    Prudence of Investment Options

57.     The court finds the testimony of the Committee's expert—Gissiner—to be highly credible regarding the prudence of the Committee's choice of investment options for the Plan.

58.     The court further finds that the evidence supports a finding of prudence both in the Committee's conduct in arriving at its choice of investment options and in the investment options themselves.

### 1.    Prudence of Committee Conduct

59.    The Committee engaged in prudent conduct in relation to its choice of investment options for the Plan, for the following reasons:

60.     For one, the Committee met regularly, at least annually since 2014 and at least quarterly since 2019. *See supra* at ¶ 11. According to Gissiner, annual meetings "can be more than sufficient" to manage retirement investments. Trial Tr. Day 3 at 150:11–153:4. Meanwhile, the plaintiffs presented no evidence that persuasively indicated that annual meetings were not sufficient for the Committee to prudently evaluate the Plan's investment options.

18

61.     The Committee relied upon not only its own assessments, but the advice of third-party consultants when monitoring investment performance, reviewing detailed monthly and quarterly reports prepared by Milliman and Fiducient that analyzed the performance of the Plan's investment options and the market generally.[5] *See supra* at ¶ 23. The Committee also used a watchlist to more heavily scrutinize underperforming investments and would vote to remove funds from the Plan's lineup that continually underperformed. *See supra* at ¶ 22. As further evidence of this process, Donigan—B. Braun's former Senior Vice President of Human Resources—testified at trial that

> [w]e worked with our advisor . . . [a]nd he would report to us as the Committee how the individual funds were performing . . . . Obviously, the index performs to the index, but the [actively managed] funds have various benchmarks and [] we would review those regularly and potentially look at putting funds on [the] watch list if we needed to.

Trial Tr. Day 1 at 126:1–:16. According to Gissiner, this process was prudent. *See* Trial Tr. Day 3 at 131:7–:9, 136:10–137:22, 143:21–144:12. Based on this evidence, the Committee had a robust and prudent process in place for monitoring the Plan's investments.

62.     Through the analyses performed, the Committee assessed on multiple occasions whether it would make sense to move the Plan's funds into lower-fee share classes. *See supra* at ¶¶ 39–41. The Committee therefore made informed decisions whenever it chose to go with higher-cost share classes. *See id.* At the same time, the Committee's process led it to occasionally move some investment options into lower-cost share classes during the Class Period when it made financial sense, e.g., when less revenue share was needed. *See supra* at ¶ 39; Trial Tr. Day 1 at 186:22–187:11. Overall, the Committee approached its lower-fee share class options with nuance depending on the situation.

---

[5] These reports were received monthly and quarterly throughout the Class Period. *See* Trial Tr. Day 1 at 74:7–:9, 162:19–:23.

63.     Lastly, the Committee prudently considered CITs as an investment option during the Class Period. For one, the Committee had already included within the Plan one CIT throughout the Class Period—the T. Rowe Price Stable Fund. *See supra* at ¶ 19. Moreover, the Committee transitioned the T. Rowe Price TDFs to the CIT version in 2019, a move that aligned with industry trends. *See supra* at ¶ 44; *see also* Trial Tr. Day 3 at 121:3–128:7 (testimony of Gissiner) (discussing how only 22% of plans offered CITs in 2010, a number that increased to 41% by 2020).

### 2.      Prudence of Investments

64.     The investment options offered by the Plan were themselves objectively prudent, for the following reasons:

65.     The Plan's T. Rowe Price TDFs, which held a majority of the Plan's assets, had a strong performance during the Class Period. *See* Trial Tr. Day 1 at 107:8–:10 (testimony of Donigan) (stating that the T. Rowe Price TDFs "did very well and continue to do well, so they're among the best performing target date funds available"); Trial Tr. Day 3 at 134:4–:6 (testimony of Gissiner) (stating that "the T. Row[e] Price funds have performed extremely well within the target date fund category pretty much for the last decade or so"). Indeed, Morningstar has identified the T. Rowe Price TDFs as especially strong performers. *See supra* at ¶ 26.

66.     Furthermore, the Plan's offerings as a whole performed well during the Class Period, performing in the top half of all comparable funds 66% of the time (and in the bottom quartile only 16% of the time). *See* Trial Tr. Day 3 at 133:20–136:9.

67.     Lastly, the Committee's wait until 2019 to transition the T. Rowe Price TDFs to the CIT version was objectively prudent because had the Committee done so sooner, there would not have been enough revenue share to pay for recordkeeping and administrative expenses. *See supra* at ¶ 44; Trial Tr. Day 3 at 100:24–107:7.

## C.   Prudence of Recordkeeping Fees

68.   The court also finds Gissiner's testimony to be highly credible regarding the prudence of the Committee's management of recordkeeping fees and choice of recordkeeper for the Plan.

69.   The court further finds that the evidence supports a finding of prudence both in the Committee's conduct in arriving at its negotiated recordkeeping fees and choice of recordkeeper and in the recordkeeping fees themselves.

### 1.   Prudence of Committee Conduct

70.   The Committee engaged in prudent conduct in relation to its management of recordkeeping fees and choice of recordkeeper for the Plan, for the following reasons:

71.   The Committee negotiated with T. Rowe Price on multiple occasions, resulting in recordkeeping fees dropping from $56 per participant in 2014 to $50 in 2016 and $42 in 2019. *See supra* at ¶ 56. As Gissiner testified, this "pattern of lower recordkeeping fees" was "[c]onsistent with [a] good fiduciary process." Trial Tr. Day 3 at 63:16–64:5.

72.   Likewise, the Committee routinely benchmarked the Plan's recordkeeping fees throughout the Class Period. For instance, the Committed hired Towers Watson in 2014 to conduct a benchmarking study, which resulted in the Committee learning that T. Rowe Price was receiving $9 more per participant in administrative revenues than the median comparator fee. *See supra* at ¶ 48. In response, the Committee negotiated a reduction in fees. *See id.* The Committee had other third-party companies conduct similar benchmarking studies in 2016 and 2017, both of which concluded that the Plan's recordkeeping fees were low when compared to other plans. *See* Oct. 2016 Fiduciary Benchmarks Report at B.BRAUN_0008428, Joint Ex. 129; Oct. 2017 Milliman Benchmark Fee Report at B.BRAUN_0012654, B.BRAUN_0012657, Joint Ex. 130. Finally, in

2018, the Committee had Milliman conduct an RFI, which resulted in all but two responses having an equal or higher recordkeeping fee than the Plan's at the time. *See supra* at ¶ 51. Furthermore, the two lower options did not contain certain services that the Plan had been enjoying under T. Rowe Price. *See id.*

73.     The Committee's decision to not switch to fee leveling until 2019 was not imprudent. For one, T. Rowe Price did not start offering fee leveling until 2018. *See* Trial Tr. Day 3 at 179:23–181:1. The Committee thus did not wait very long to consider fee leveling when it became an option for the Plan through T. Rowe Price. *See id.* at ¶ 52; Trial Tr. Day 3 at 180:24–181:1.

74.     Moreover, when the Committee switched to fee leveling, the practice had not become the industry standard yet. As Vestal—B. Braun's Vice President of Corporate Benefits and Human Resources Administration—testified, "fee leveling, even when we started, there weren't that many companies. It was a relatively new concept." Trial Tr. Day 1 at 196:21–197:6.

75.     Ultimately, the Committee managed to transition to a fee leveling arrangement within a year of it becoming available to them under T. Rowe Price, and even negotiated a fee reduction to $42 per participant. *See supra* at ¶¶ 52, 56.

76.     Following its transition to fee leveling, B. Braun retained Mercer to conduct a formal RFP at the request of the Committee. *See supra* at ¶ 53. This RFP involved the Committee reading through detailed responses from seven candidates, selecting three finalists, and ultimately choosing Empower as its next recordkeeper because the company ranked first among the finalists in all but one category. *See id.*

77.     While Empower's recordkeeping fees ended up increasing the Plan's recordkeeping costs to $45 per participant, this constituted a difference of only $3 per participant

from its previous fee costs with T. Rowe Price. *See supra* at ¶ 56. Indeed, Fiducient performed a benchmarking study in 2021 that concluded that the Plan's recordkeeping fees were still less per participant than the average recordkeeping fees for two comparators. *See supra* at ¶ 55. Furthermore, the Committee found the small increase in cost justifiable due to what it perceived to be a superior level of service from Empower. *See* Trial Tr. Day 2 at 166:22–168:1; 215:5–:25; Trial Tr. Day 3 at 94:10–:17.

78.     All the above actions—the negotiations, the routine benchmarking, and the RFP— demonstrate that the Committee behaved prudently in its monitoring of recordkeeping fees and selection of recordkeeper for the Plan. *See* Trial Tr. Day 3 at 64:10–65:1 (testimony of Gissiner).

### 2.     Prudence of Fees

79.     The recordkeeping fees incurred by the Plan were themselves objectively prudent, for the following reasons:

80.     As noted above, the Committee negotiated down the recordkeeping fees per participant on multiple occasions throughout the Class Period. *See supra* at ¶ 71.

81.     Additionally, a combination of the multiple aforementioned benchmarking studies, the RFI conducted by Milliman, and two independent analyses conducted by Gissiner overwhelmingly show that the Plan's recordkeeping fees were routinely below average. *See supra* at ¶ 72; Trial Tr. Day 3 at 71:10–72:7, 73:20–74:22.

82.     While the Committee could have chosen Voya as its recordkeeper during the RFP for a cost of $26 per participant, that decision would have required the Committee to sacrifice the Plan's "open architecture" structure and instead offer Voya's proprietary funds. *See supra* at ¶ 54. Voya's "open architecture" costs were $43 per participant, only $2 per participant cheaper than

the costs of Empower, the recordkeeper that outperformed all other companies in almost every category during the RFP. *See supra* ¶¶ 54, 76.

83.     The lack of adoption of the Voya "closed architecture" deal was therefore objectively reasonable because dramatically changing the investments offered to the Plan's participants may not have been worth the ultimate savings in recordkeeping expenses. *See* Trial Tr. Day 1 at 171:16–173:2, 181:18–182:12. Moreover, the adoption of Empower over Voya's "open architecture" deal was objectively reasonable because the services offered by Empower were deemed by the Committee better enough for the Plan to justify Empower's $45 per participant cost over Voya's $43 per participant cost. *See* Trial Tr. Day 3 at 85:14-86:3 (testimony of Gissiner) (testifying how plan sponsors are "not going to select the recordkeeper with the lowest fee, absent" considerations about "services, capabilities, technology, and things of that nature").

84.     Finally, the lack of adoption of fee leveling until 2019 was not imprudent. As Gissiner testified, the use of revenue sharing to pay for recordkeeping fees prior to 2019 was consistent with industry practices at the time. *See* Trial Tr. Day 3 at 96:7–97:5. The plaintiffs' expert—Dyson—also testified that there was nothing wrong with using revenue sharing to pay for recordkeeping fees. *See* Trial Tr. Day 2 at 111:23–112:1. Indeed, both parties agree that revenue sharing is a common and permissible way to pay recordkeeping fees so long as the arrangement is reasonable. *See supra* at ¶ 29.

## III.    DISCUSSION

Upon the above findings of fact, the court concludes that the Committee did not violate any fiduciary duty of prudence during the Class Period. Under ERISA, plan fiduciaries must discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Such duties include "monitor[ing] investments and remov[ing] imprudent ones." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 741 (2022) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). Plan fiduciaries can potentially breach their duty of prudence by, *inter alia*, "retaining recordkeepers that charged excessive fees, offering options likely to confuse investors, and neglecting to provide cheaper and otherwise-identical alternative investments." *Id.*; *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 328–29 (3d Cir. 2019) ("[F]iduciaries should be vigilant in negotiation of the specific formula and methodology by which fee payments . . . will be credited to the plan . . . . Fiduciaries must also consider a plan's power . . . to obtain favorable investment products, particularly when [they] are substantially identical—other than their lower cost—to products . . . already selected." (third omission in original) (internal quotation marks and citations omitted)).

To prevail in a duty-of-prudence case under ERISA, a plaintiff must demonstrate that a plan fiduciary failed to both (1) engage in objectively prudent conduct "in arriving at [its] investment decision[s]," and (2) make decisions that "led to objectively prudent investments." *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011). Thus, the outcome of such a case hinges on the application of a reasonable person standard. *See Perelman v. Perelman*, No. 10-5622, 2012 WL 3704783, at *4 (E.D. Pa. Aug. 28, 2012) (noting that 29 U.S.C. § 1104 "impos[es] a reasonable man standard"). A "determination of reasonableness" is a question of fact to be resolved by the factfinder, in this case the court. *Pension Fund-Mid Jersey Trucking Indus.-Local 701 v. Omni Funding Grp.*, 731 F. Supp. 161, 169 (D.N.J. 1990); *cf. Gravely v. Speranza*, 219 F. App'x 213, 215 (3d Cir. 2007) (per curiam) ("[D]etermining the question of reasonableness is frequently one that should be left to the ultimate factfinder . . . ."). Here, as noted above, the court has found that the Committee's conduct was objectively prudent in its monitoring and selection of alternative investment funds and recordkeeping fees. Likewise, the court has found that the ultimate

investment options and recordkeeping fees were objectively prudent. Accordingly, the court must find for the Committee and against the plaintiffs.

Beginning with the investment options, the Committee's monitoring and selection process was reasonably prudent. As mentioned earlier, the Committee met regularly to evaluate the Plan's investment options. *See supra* at ¶ 60. Moreover, the Committee relied on advisors and watchlists to ensure that the Plan's investment options were not underperforming, even voting to remove funds that were. *See supra* at ¶ 61. Finally, the Committee demonstrably considered making changes to the Plan such as moving funds to lower-fee share classes and adopting CITs, choosing or not choosing to make such changes at various times throughout the Class Period upon a balance of considerations. *See supra* at ¶¶ 62–63. These findings of fact all support the conclusion that the Committee behaved objectively prudent "in arriving at [its] investment decision[s]." *Renfro*, 671 F.3d at 322. Based on this conclusion alone, the court could find that the Committee did not breach its duty of prudence with regard to the Plan's investment options. *See id.*

Nevertheless, the court can alternatively reach such a finding because the investment options themselves were reasonably prudent. Indeed, the Plan's overall offerings performed in the top half of comparable funds for the majority of the Class Period. *See supra* at ¶ 66. The Plan's T. Rowe Price TDFs were especially strong in performance. *See supra* at ¶ 65. And even though the T. Rowe Price TDFs did not transition to the CIT version until 2019, this was ultimately a prudent move because the Plan did not have enough revenue share to accommodate an earlier transition. *See supra* at ¶ 67. Thus, the court can conclude that the Committee did not breach its duty of prudence because the Plan's investment options were "objectively prudent." *Renfro*, 671 F.3d at 322.

Turning to recordkeeping, the Committee's process of monitoring recordkeeping fees and selecting a new recordkeeper was reasonably prudent. To begin, the Committee clearly negotiated down the Plan's recordkeeping fees per participant on numerous occasions. *See supra* at ¶ 71. The Committee also regularly utilized third-party consultants to benchmark the Plan's recordkeeping fees, only one of which concluded that the Plan's fees were higher than usual, which itself resulted in the Committees negotiating a reduction in fees. *See supra* at ¶ 72. When it came to fee leveling, the Committee transitioned the Plan to such an arrangement within a year of it becoming available and at a time when fee leveling was becoming more popular in the industry. *See supra* at ¶¶ 73–75. Finally, the Committee conducted an RFP during which it ranked seven options by taking into account a variety of considerations, ultimately choosing a company that ranked highest by almost every metric. *See supra* at ¶¶ 76–77. Together, these findings of fact allow the court to conclude that the Committee engaged in objectively prudent conduct "in arriving at [its] [recordkeeping] decision[s]" and accordingly did not breach its duty of prudence. *Renfro*, 671 F.3d at 322.

Again though, the court may instead reach such a conclusion through its finding that the Plan's recordkeeping fees were objectively prudent, *see id.*, which they were throughout the Class Period. The recordkeeping fees per participant largely experienced a downward trajectory during said period and were considered lower than average through multiple benchmarking studies. *See supra* at ¶¶ 80–81. Moreover, the adoption of Empower as the Plan's new recordkeeper was reasonable because the recordkeeping fees per participant only slightly increased while the Plan received what the Committee believed to be better service. *See supra* at ¶¶ 82–83. And even though the Plan did not use fee leveling until 2019, this was in line with industry practices. *See supra* at ¶ 84. Consequently, the court can conclude that the Committee did not breach its duty of prudence because the Plan's recordkeeping fees were "objectively prudent." *Renfro*, 671 F.3d at 322.

## IV.    CONCLUSIONS OF LAW

1.     The Committee did not breach its duty of prudence under ERISA during the Class Period with regard to the Plan's investment funds because the Committee had in place an objectively prudent process for monitoring and managing said investment funds.

2.     The Committee did not breach its duty of prudence under ERISA during the Class Period with regard to the Plan's investment funds because said investment funds were objectively prudent.

3.     The Committee did not breach its duty of prudence under ERISA during the Class Period with regard to the Plan's recordkeeping expenses because the Committee had in place an objectively prudent process for monitoring and negotiating recordkeeping fees and selecting a new recordkeeper.

4.     The Committee did not breach its duty of prudence under ERISA during the Class Period with regard to the Plan's recordkeeping expenses because the Plan's recordkeeping fees and choice of new recordkeeper were objectively prudent.

The court will enter a separate order and judgment.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.